## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| BIOTAB, LLC D/B/A BIOTAB HEALTHCARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:25-cv-0384 |
| | ) | |
| ADAM V. FOX and | ) | JURY TRIAL DEMANDED |
| | ) | |
| WEST SIDE MEDICAL SUPPLY, INC. D/B/A ELITE COMPRESSION & BRACING, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, BioTAB, LLC d/b/a BioTAB Healthcare, by and through its attorneys, brings this Complaint seeking injunctive relief and money damages as follows:

## NATURE OF ACTION

1.      Plaintiff BioTAB, LLC d/b/a BioTAB Healthcare ("BioTAB" or "Plaintiff") brings this action against Defendant Adam V. Fox ("Fox"), a former a Clinical Territory Manager of BioTAB, and West Side Medical Supply, Inc. d/b/a Elite Compression & Bracing, (Elite), a direct competitor of BioTAB.

2.      This Verified Complaint arises out of Fox's disregard for the terms of Employment Agreements ("Agreements") he entered into with BioTAB, and from federal and Missouri law.  A copy of the Employment Agreements are attached to this Verified Complaint as Exhibits A and B.

3.     On or before Fox's voluntarily resignation from his employment, effective March 10, 2025, as a long-tenured senior Clinical Territory Manager with BioTAB, BioTAB learned Fox had accepted new employment, in a similar position at Elite, a direct competitor of BioTAB.

4.     Upon information and belief, since leaving BioTAB, Fox has solicited and continues to solicit BioTAB's referral sources and patients with the knowledge of and for the benefit of Elite.

5.     Upon information and belief, Fox acting as an agent of Elite has, intends to, or will inevitably utilize BioTAB confidential information and/or trade secrets in performing his work for Elite, which, like BioTAB, services referral sources and patients in a niche healthcare market servicing patients diagnosed with lymphedema, venous insufficiency, and peripheral arterial disease.

6.     Fox's actions are in blatant and intentional disregard of his contractual and other legal obligations to BioTAB.  Likewise, Elite's inducement, encouragement and acceptance of the financial benefits of Fox's material breaches of his contractual obligations to BioTAB, and its interference with BioTAB's reasonable business expectancies is blatant and intentional.

7.     In this action, BioTAB seeks, inter alia, temporary, preliminary, and permanent injunctive relief to enforce promises made by Fox, and to prevent Fox from unfairly competing with BioTAB, soliciting its customers, *i.e.* referral sources and patients, and misappropriating BioTAB's confidential and trade secret information.

## PARTIES, JURISDICTION AND VENUE

8.     BioTAB is a limited liability company formed and existing under the law of the State of Missouri with its principal place of business located at 11701 Borman Dr., Ste. 107, St. Louis, MO 63146.  Thus, BioTAB is a citizen of the State of Missouri.

9.     Upon information and belief, Fox is an adult citizen and resident of the State of Kansas who resides at 8908 Pine St., Lenexa, KS 66220.

10.    Upon information and belief, West Side Medical Supply, Inc. d/b/a Elite Compression & Bracing, is a corporation formed and existing under the laws of the State of Kansas with its principal place of business located at 18 N. Sandpiper Ct., Wichita, KS 67230. Justin Gooden is the Registered Agent with a registered address of 602 N. Webb Rd. Ste. 108. Wichita, KS 67206.  Thus, Elite is a citizen of the State of Kansas.

11.    Accordingly, there is complete diversity jurisdiction between BioTAB and the named Defendants.

12.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action includes claims arising under the laws of the United States, specifically, the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, et seq. and  pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the parties are citizens of different states, and the amount in controversy exceeds $75,000). The Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. §1367 because the claims are so related to the DTSA claims for which this Court has original jurisdiction that they form part of the same controversy.

13.    This Court has personal jurisdiction over Defendant Fox because he has submitted to the jurisdiction of this Court because: (a) he entered into the Agreement which is the subject matter of this action in this State; (b) submitted to and consented to the jurisdiction of this Court under the terms of the Agreement, which is the subject matter of this action; and (c) actively transacted business within this State in the performance of his job duties on behalf of BioTAB and Defendant Elite. In addition, Fox's tortious interference with contracts and/or contractual expectancies of BioTAB and his misappropriation of BioTAB's trade secrets, as alleged below, would reasonably be expected to impact the financial condition of BioTAB in this State, and Fox

knew or reasonably should have known that his actions would reasonably be expected to have a financial impact upon an entity in this State.

14.    This Court has personal jurisdiction over Defendant Elite because, by and through its agents, including Fox, it transacts business in the State of Missouri.  In addition, Elite's tortious interference with contracts and/or contractual expectancies of BioTAB and its misappropriation of BioTAB's trade secrets, as alleged below, would reasonably be expected to impact the financial condition of BioTAB in this State, and Elite knew or reasonably should have known that its actions would reasonably be expected to have a financial impact upon an entity in this State.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Plaintiff is located this District, and the events giving rise to the claims in this action occurred in substantial part in this District.  Pursuant to the Agreements, jurisdiction and venue are proper in this Court, Exh, A and B, § 7.10.

## ALLEGATIONS COMMON TO ALL COUNTS

### *BioTAB's Business Operations*

16.    BioTAB is a St. Louis, Missouri based durable medical equipment company that provides in-home Gradient Sequential Pneumatic Compression Pumps and Garments, with specialized in-home installation.

17.    BioTAB's advanced compression therapy products and services serve a narrow niche healthcare market for patients diagnosed with lymphedema, venous insufficiency and peripheral arterial disease ("BioTAB Market").  Since 2003, BioTAB has regularly and continuously operated throughout the United States, including Missouri and Kansas.

18.    BioTAB's business model relies heavily on referrals from vascular surgeons, oncology physicians, occupational and physical therapists, and wound care specialists for patients.

These referral sources are, in essence, BioTAB's customers and collectively establish its customer base (collectively "customers").

19.     BioTAB's has institutional business relationships with its customers that have taken years of effort and significant financial investments to accumulate and cultivate. Specially, over the years, BioTAB has established significant goodwill and customer relationships in the niche healthcare market by maintaining regular, continuous and systematic contacts with its customers; and by providing superior products and services to patients. In doing so, BioTAB has accumulated a proprietary and confidential customer base of between 35-50 customers in the East Kansas City Missouri Metropolitan market.

20.     BioTAB develops, compiles, and maintains extensive information about its business operations, finances, customers, and patients. BioTAB owns, possesses, and has developed certain nonpublic, confidential and proprietary information, including customer base lists; marketing plans and research and compilation of data related thereto, customer list and key contacts thereof, key contacts of customers and historical sales data related to customers, negotiated third-party reimbursements rates, specialized training materials, competitive intelligence data, design and manufacturing of durable medical equipment, financial sales data, business strategies; current and planned product development and activities; budgets and other forecasts; and unpublished information about sales and profits (collectively and individually hereinafter "Trade Secrets").

21.     BioTAB also gathers confidential information regarding its customer's practices, unique requirements and special needs, as a result of years of targeted research, and customer source development. BioTAB also maintains information regarding patients. This confidential information includes, but is not limited to, key contacts of customers and historical sales and billing

data related to customers, sales data, financial information, patient identifiable information, and patient trial and care information ("Confidential Information").

22.    BioTAB's relationships with its customers and its Trade Secret and Confidential Information are valuable and critical assets of BioTAB's business, so much so, that BioTAB requires individuals with access to this information to sign and abide by certain nondisclosure obligations, as set forth in the Agreements and other BioTAB agreements and policies. This Trade Secret and Confidential Information is not known by third parties outside of BioTAB and cannot be compiled and organized through public resources.

23.    The aforementioned Trade Secret and Confidential Information has significant economic value to BioTAB and would be of significant economic value to its competitors.

24.    BioTAB places great importance on protecting Trade Secrets and Confidential Information, which is iterated in BioTAB's Corporate Compliance Manual Code of Conduct and Compliance Procedures, which provides:

<u>Confidentiality of Patient Information</u>

BioTAB and its consulting facilities personnel should strive to maintain the confidentiality of patient records and other business-type confidential information in accordance with all laws.

<u>Patient Information — Privacy & Security.</u> All personnel have a responsibility for protecting the confidentiality of patient information. Personnel must not reveal (regardless if communication is verbal, written, fax, electronic) any personal or confidential information such as diagnosis or treatments, etc., unless disclosure is supported by the applicable laws and/or the information is treated as required pursuant to the Health Insurance Portability and Accountability Act (HIPPA) and corresponding regulations. If questions arise regarding confidential information or releasing information, personnel should seek guidance from the Compliance Officer.

<u>Business Information.</u> Information, ideas and some business information are important aspects to an organization's success. Information regarding our competitive position or business strategies, payment and reimbursement information and negotiations with personnel or third parties should be protected and remain confidential.

6

25.    Additionally, BioTAB's Employee Handbook provides:

Confidential Information

Employees of BioTAB hear, see, and/or process sensitive confidential personal information regarding future, current, or past customers, employees, or suppliers of BioTAB. These customers and suppliers entrust BioTAB with important information and the nature of our ongoing relationship requires the maintenance of strictest confidentiality. In safeguarding the information received, BioTAB earns the respect and further trust of our customers and suppliers.

Confidential information may only be released or disclosed upon the written request of a customer, subpoena by an authorized attorney, physician, court of law, duly authorized representatives of the federal, state, county, or city government, third party payer, appropriately appointed guardian, executor, or trustee.

BioTAB must have the customer's signed authorization to release information to anyone, except when appropriately executed subpoena is presented. Your employment with BioTAB assumes an obligation to maintain this confidentiality, even after you leave our employment. Disclosure of confidential information may be cause for dismissal.

Original records may not be removed from BioTAB property. Copies are permitted when released in conformance with BioTAB rules and regulations.

Standards of Conduct

By accepting employment with us, you have a responsibility to BioTAB and to your fellow employees to adhere to certain rules of behavior and conduct. The purpose of these rules is not to restrict your rights, but rather to be certain that you understand what conduct is expected and necessary. When each person is aware that he or she can fully depend upon fellow workers to follow the rules of conduct, then our organization will be a better place for everyone to work.

Unacceptable Activities

BioTAB has established standards of conduct that help preserve a sense of order and propriety. Violation of these and any other rules will bring about disciplinary action, which may include termination of employment.

******

7

Unauthorized disclosure of company information including confidential patient information.

26.     BioTAB takes great effort to protect its Confidential Information by limiting employees' access to this information contained in its customer relationship management (CRM) system -- Salesforce.  Salesforce is a combination of software and databases of external and internal information about current and potential customers that allows BioTAB to develop and manage their sales business. Salesforce has dozens of applications that utilize the CRM databases to improve BioTAB's front-line, day-to-day functions of selling, servicing, and marketing to customers.  As such, BioTAB uses Salesforce as the main depository of most, if not all, customer and patient data.  Salesforce further provides access and use that permits BioTAB to track and limit who is accessing the information.

27.     BioTAB has made a reasonable effort and took reasonable steps to keep its Trade Secret and Confidential Information secret, including by: maintaining the information in a secure servers, using software requiring a username, and password, multi-factor authentication, keeping data siloed in multiple computer servers, and by having its employees sign agreements to agree to maintain the confidentiality of the information, by maintaining policies and procedures to maintain the confidentiality of the information, training its employees on the importance of maintaining confidentiality, by taking steps to determine whether breaches of the information occurred and, if so, responding accordingly, and by taking legal action where necessary to protect the information.

28.     BioTAB employs Clinical Territory Managers as sales representatives that cover the regions of its operations.  BioTAB provides its Clinical Territory Managers, including Fox, with specialized training, use of their established goodwill, and access to and use of its Confidential Information and Trade Secrets to allow its Clinical Territory Managers to perform their job duties on behalf of and for the exclusive benefit of BioTAB.

29.     Clinical Territory Managers, including Fox, are expected to develop and maintain close business relationships with BioTAB's customers and patients, and are provided access and use to BioTAB's Trade Secrets and Confidential Information.  Clinical Territory Managers, including Fox, would not have had access to BioTAB's institutional customer base information and data related thereto, or any of its Confidential Information or Trade Secrets, were it not for their employment at BioTAB.

30.     To protect BioTAB's Trade Secrets and Confidential Information, the goodwill BioTAB has built with its customers and patients, and its investment in the employees it trained and financially supports, BioTAB requires certain employees to execute the Employment Agreements that contain non-competition, non-solicitation, and non-disclosure provisions.

### *Fox's Employment with BioTAB*

31.     Fox began working for BioTAB on June 13, 2022.  At all relevant times, Fox was a Clinical Territory Manager for the East Kansas City, Missouri, Metropolitan area which covers several counties in Missouri ("Territory").

32.     Prior to his employment, Fox was a medical scribe with no prior sales work experience in the BioTAB Market.  He was not familiar with, nor did he have any established accounts with any vascular surgeons, oncology physicians, or occupational and physical therapist practicing in the BioTAB Market, *i.e.*, no prior book business or transferring customer accounts.

33.     Having no prior accounts or customers, BioTAB assigned Fox approximately 35-50  institutional and well-established customer accounts located in his East Kansas City Missouri territory. BioTAB also provided Fox with 75-90 "target leads" that consisted providers who specialized in the type of patients served by BioTAB ("Target Leads").  Fox's role was to schedule educational meetings with these Target Leads to support care for patients who qualify and would

benefit from BioTAB's services Thus, Fox acquired his entire customer base, patients and all target leads exclusively from BioTAB.

34.    BioTAB invested substantial time and effort into introducing Fox to his assigned customer accounts and assisted Fox in establishing relationships with his assigned customers and targeted leads by providing Fox with specialized training, use of BioTAB's goodwill, access to and use of BioTAB's Confidential Information and Trade Secrets, and by providing Fox with all necessary financial assistance to maintain and grow the accounts.

35.    BioTAB provided Fox with specialized training of its day-to-day operations, business strategies, billing procedures, product knowledge, performing educational meetings for Target Leads, conducting patient trials and ongoing patient care, performing the essential functions of the position, customer relationship management, and sales techniques. Collectively, the specialized training provided Fox with the proverbial "playbook" of BioTAB's operations, business strategies, and how to excel in the niche BioTAB Market.

36.    Further, by virtue of his job duties, and in order to perform his duties at BioTAB, Fox was given access to and use of, was exposed to, and relied upon, BioTAB's Confidential Information and Trade Secrets; and had full access and use of all data maintained in Salesforce for his assigned territory.

37.    To protect its legitimate interests and as a condition of his employment, on June 13, 2022, Fox signed the Employment Agreement and returned it to BioTAB ("Agreement I"), attached hereto as Exhibit A.

*Fox's Post-Employment Restrictive Covenants*

38.    Agreement I sets forth the following Non-Disclosure provisions:

During and following the Employment Period, the Employee will hold in confidence the Confidential Information and will not use it or disclose it to any person except with the specific prior written consent of the Company.

Any trade secrets of the Company will be entitled to all of the protections and benefits under applicable law. If any information that the Company deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. Employee hereby waives any requirement that the Company submit proof of the economic value of any trade secret or post a bond or other security.

Employee will not remove Confidential Information from the Company's premises (except to the extent such removal is for purposes of the performance of the Employee's duties at home or while traveling, or except as otherwise specifically authorized by the Company). Employee recognizes that, as between the Company and the Employee, all of the Proprietary Items, whether or not developed by the Employee, are the exclusive property of the Company. Upon termination of this Agreement by either party, or upon the request of the Company during the Employment Period, the Employee will return to the Company all of the Proprietary Items in the Employee's possession or subject to the Employee's control, and, as applicable, the Employee shall not employ any copies, abstracts, sketches, or other physical or electronic embodiment of any of the Proprietary Items. See, Exhibit A, § 5.2(a)-(b), (d).

39.    Per the terms of the Agreement I, and by signing the Agreement, Fox acknowledged he expressly understood his confidentiality obligations survive the termination of his employment relationship with BioTAB. See, Exhibit. A, § 5.2(a) and 7.2.

40.    As described in further detail herein, Fox has violated the Non-Disclosure obligations by targeting and unlawfully exporting patient health information to his personal e-mail account and disclosing and using BioTAB's Confidential Information and Trade Secrets for solicitation and selling competitive products on behalf of Elite.

41.    Agreement I contains the following Non-Competition provision:

Employee covenants that employee will not, directly or indirectly: [D]uring the employment Period, except in the course of Employee's employment hereunder, and during the Post-Employment Period, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend the Employee's name or any similar name to, lend Employee's

credit to or render services or advice to, any business whose products, services or activities compete in whole or in part with the products, services or activities of the Business within the Territory; provided, however, that the Employee may purchase or otherwise acquire up to (but not more than) five percent of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934. See, Exhibit A, § 6.2(a)

42. Per the terms of Agreement I, and by signing Agreement I, Fox agreed the time period and the geographic scope were the minimum necessary to reasonably and adequately protect BioTAB. See Exhibit A, §6.1 and §§ 1.8, 1.11, which define the "Post Employment Period" and "Territory" as follows:

1.8. POST-EMPLOYMENT PERIOD" means the eighteen (18) month period beginning on the date of termination of the Employee's employment under this Agreement as an Employee of the Company.

1.11. "TERRITORY" means the area within the borders of the jurisdictions listed in paragraph (IV) of Exhibit C [Kansas City Missouri Metropolitan Area that was subsequently defined as East Kansas City Missouri market].

43. As described in further detail herein, Fox has violated the Non-Competition provision by accepting employment with Elite in a nearly identical position, for the purpose to sell competitive compression devices to BioTAB's customer base, e.g., referral sources and customers.

44. Agreement I also contains the following Non-Solicitation provisions:

[W] hether for the Employee's own account or for the account of any other person, at any time during the Employment Period and the Post-Employment Period, solicit business of the same or similar type as the Business, from any person known by the Employee to be a customer or Referral Source of the Company, whether or not the Employee had personal contact with such person during and by reason of the Employee's engagement with the Company See, Exhibit A, § 6.2(b)

45. As described more fully below, Fox has and continues to violate the Non-Solicitation provision of Agreement I.

46. Agreement I also contains the following Notification provisions:

The Employee will, while the covenant under this Section 6.2 is in effect, give notice to the Company, within ten (10) days after accepting any other employment or employment relationship, of the identity of the Employee's new employer or principal, as the case may be. The Company may notify any person so identified that the Employee is bound by this Agreement and, at the Company's election, furnish such person with a copy of this Agreement or relevant portions hereof. See, Exhibit A, § 6.2(d).

47.    As described more fully below, Fox failed to comply with his notification obligations.

48.    Shortly thereafter, on August 12, 2022, Fox signed and delivered to BioTAB a slightly revised Employment Agreement that contained some additional terms and specifically acknowledged and reaffirmed the restrictive covenants set forth in Agreement II, which is attached hereto as Exhibit B ("Agreement II").

49.    Agreement II provides:

PRIOR AGREEMENT. Employee acknowledges and agrees that the Prior Agreement, previously entered into by and between Employee and the Company, included a covenant restricting Employee's right compete with the Company following the end of Employee's employment with the Company ("Restriction on Competition"), as described in Section 6.2(a) of the prior Agreement. Employee acknowledges and agrees that nothing in this Agreement supersedes or limits the Restriction on Competition, and that the Restriction on Competition remains in full force and effect. See, Exhibit B, § 6.2

For purposes of clarity only and not in contradiction, this Agreement does not supersede the Restriction on Competition referenced in Section 6.2 of this Agreement and assigned Territories shall remain the same as set forth in Exhibit C to the Prior Agreement. See, Exhibit B, § 7.8

50.    Agreement II also contains the following Non-Interference provisions:

Employee covenants that Employee will not, directly or indirectly, whether for the Employee's own account or for the account of any other person or entity, at any time during the Employment Period and the Post-Employment Period

call upon, solicit, divert, or take away the business of any customer, client, vendor, supplier, or other business partner (collectively, "Business Partners") of the Company who is or was a Business Partner within the prior six months, or prospective Business Partners of the Company, or to make any such attempt. See, Exhibit B, § 6.3(b)

51.     Per the terms of Agreement II, and by signing Agreement II, Fox confirmed that he had consulted and was advised by his own independent counsel in all respects concerning the reasonableness and propriety of the post-employment covenants. See Exhibit B, § 7.2.

52.     Over time and with BioTAB's continuous support, Fox through frequent, consistent and systematic contacts with the BioTAB customers successfully established professional relationships with several of the assigned customer accounts and eventually became the face of BioTAB for those customers and, consequently, those customers attached BioTAB's previously established goodwill to Fox.  Fox was able to generate a few of new accounts as well. As a result, Fox's was placed in a unique position of having a special influence over several of BioTAB's customers.

53.     Fox has intimate knowledge of BioTAB's Trade Secret and Confidential Information concerning its business plans and strategies, referral and patient base customer lists, financial information concerning the company's products, and other proprietary information relating to BioTAB's business, the disclosure and misappropriation of which poses a significant threat to BioTAB's ongoing business.

***Fox's Resignation of Employment***

54.     On March 5, 2025, during a regularly scheduled bi-weekly telephone call with his supervisor, Raymond Corey Regional Sales Manager ("Corey"), Fox provided BioTAB with his two week notice of resignation.  Corey and Fox then discussed the transition plan to introduce Frank Burdolski to Fox's current accounts and requested a list of active referral sources or accounts he was currently working with.

55.     During the telephone call, Fox further explained to Corey that his head was not in it anymore and that it wasn't fair to BioTAB or the patients for him to continue his employment

with BioTAB. Fox further stated he did not have any jobs set up and did not know what the future held.  As set forth below, Fox's statements to Corey were knowingly false and intentionally misleading.

56.     On March 6, Fox e-mailed his resignation letter to Corey.

***Fox's Orchestrated  Scheme to Engage in Unlawful Competition***

57.     Despite Fox's representation to the contrary, on March 10, 2025, BioTAB discovered that Fox had, in fact, accepted work with its direct competitor Elite and was working for Elite and performing the same, if not, identical work as he was performing for BioTAB, while he was still employed by BioTAB.

58.     BioTAB further discovered that Fox was accessing BioTAB's Confidential Information and Trade Secrets to use in his active solicitation of BioTAB's  patients and to sell competitive products and services to BioTAB's customers on behalf of Elite, while still employed by BioTAB.

59.     Upon information and belief, Elite had knowledge of Fox's agreements with BioTAB and induced Fox's breach of those agreements; and was complicit and encouraged Fox's disclosures and use of BioTAB's Confidential Information and Trade Secrets, and his solicitation of BioTAB's customers.

60.     Elite sells competitive and nearly identical compression therapy devises as BioTAB.   Both companies use the same supplier, Bio Compression, that manufactures compression therapy devices that are sold under its own brand name.  BioTAB, however, has private labeled devices manufactured through Bio Compression that have BioTAB branding and different casing and garment colors.  BioTAB's private label devices have identical functionality,

mechanics and specifications brand name products that are sold by Elite. Both devices are considered equivalent in terms of reimbursement under medical billing codes.

61.    Upon discovery of Fox's gross misconduct, directly competitive activity, and disloyalty, BioTAB immediately terminated Fox's employment on March 10, 2025.

62.    BioTAB further discovered that Fox had intentionally not processed or scheduled patient appointment, trials, and product demonstrations, i.e., "initial response to treatment", for the purpose of postponing the patient trials and appointments to when he began to perform work on behalf of Elite. Then it was discovered, that Fox, while still employed by BioTAB, had begun to solicit patients and intentionally divert BioTAB's patient appointments/trials to Elite by scheduling BioTAB's patient trials and appointments with Elite after his departure date rather than scheduling the appointments with BioTAB.

63.    On March 14, 2025, Fox's largest account comprising approximately 50% of his business, Healient Wound Care, ("Healient"), notified BioTAB that it wanted to close out their current patients accounts and informed BioTAB that that they were going transfer their business to Fox at Elite. Likewise, another large customer, University Health Vascular Clinic, notified BioTAB that it too was terminating its business with BioTAB and would continue to use Fox.

64.    Later that same day, a BioTAB employee who was unaware of the prior notification, went to the Healient clinic but was not allowed entry. The employee was informed that Healient was going to cease doing business with BioTAB and planned on using Fox and Elite for their future compression pump needs.

65.    On March 17, 2025, a BioTAB employee contacted a patient to schedule a fitting appointment. The patient informed the BioTAB employee that they had already scheduled the

fitting appointment with Fox for the following week and that Fox was going to drop off a "similar" pump to what he had previously shown them.

66.    On March 20, 2025, BioTAB discovered that Fox had actively solicited another referral source and had induced patients to schedule an appointment with him through Elite instead of his regular provider, BioTAB.

67.    Upon further forensic investigation, BioTAB uncovered that during his employment Fox actively targeted and exported Confidential Information and Trade Secrets pertaining to customers and patients to his personal e-mail account for no legitimate business purpose, in direct violation of his contractual obligations and BioTAB polices.

68.    By virtue of Fox accepting a position with a direct competitor in violation of his non-competition, non-disclosure, and non-solicitation obligations noted above, Fox has breached his Agreements-- and absent injunctive restraints will imminently continue to breach -- the terms of the restrictive covenants that he agreed upon in two Agreements with BioTAB, which are attached as Exhs. A and B.

69.    Upon information and belief, and as BioTAB expects to establish upon further investigation and discovery, absent judicial intervention in the form of an injunction, Fox will continue his orchestrated unfair competition scheme in direct violation of, and will continue to violate, his contractual obligations.

70.    As a consequence of the foregoing, BioTAB faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

## COUNT I
## <u>BREACH OF EMPLOYMENT AGREEMENTS</u>
### (Against Fox )

71.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

72.     Based on the Covenant's choice-of-law provision, this claim is governed by Missouri law. See Ex. B, § 7.9.

73.     Fox entered into the Agreement I and Agreement II that are valid and enforceable agreements with BioTAB.  The Agreements are supported by consideration, as Fox received employment, continued employment, use of BioTAB's goodwill, specialized training, and access and use to BioTAB's Confidential Information and Trade Secrets.

74.     Fox agreed to abide by the terms of the Agreement I and Agreement II, including the noncompetition, non-solicitation, and non-disclosure provisions contained therein.

75.     The non-competition, non-solicitation, and non-disclosure provisions are reasonable, and no greater than fairly required to protect and preserve BioTAB's legitimate protectable interests.

76.     BioTAB fully performed its obligations under the Agreement by, inter alia, providing Fox with access and use of its Confidential Information, Trade Secrets, goodwill, and properly compensating Fox all salary and commissions earned and due on the date of his termination in accordance with the terms of the Employment Agreement.  Furthermore, BioTAB conducted an annual in-service with Fox, conducted an annual competency test, and verified insurance benefits for patients and communicated the benefit information to Fox.  Nevertheless, as described above and below, Fox breached the Agreement.

77.     Fox materially breached the non-competition provision in Agreement I by accepting employment or an engagement with Elite, a direct competitor of BioTAB.

18

78. Fox materially breached the non-disclosure provisions in Agreements I and Agreement II by emailing BioTAB's Trade Secrets and/or Confidential information to his personal email account; and by disclosing to Elite and using BioTAB's Trade Secrets and/or Confidential information to actively compete with BioTAB during and after his employment with BioTAB.

79. Fox materially breached the non-disclosure and return of property provisions in Agreement I and II by, upon information and belief, using a personal computer to receive, store, and review BioTAB Confidential Information and Trade Secrets that remains in Fox's control and custody.

80. Fox materially breached the non-disclosure and return of property provisions in Agreement I and II by, upon information and belief, making and retaining copies and/or duplicates of BioTAB's Confidential Information and Trade Secrets.

81. Fox's will inevitably breach the non-disclosure provisions in Agreements I and II by nature of his employment at Elite.

82. Fox materially breached the non-solicitation provisions in Agreement I by soliciting, inducing or attempting to induce BioTAB's customers, e.g., referral sources and patients to terminate, diminish, or materially alter their relationship with BioTAB.

83. Fox materially breached the non-solicitation and/or non-interference provisions in Agreement I and II  by soliciting or assisting Elite in the solicitation of BioTAB's customer to induce or attempt to induce such customer to purchase or contract for product or services from Elite.

84. Fox breached the notification requirement in Agreement I and II by not providing BioTAB notice, within ten (10) days, of accepting employment with Elite.

85.    As a direct and proximate result of Fox's breaches of Agreement I and/or Agreement II, BioTAB has sustained and continues to suffer damages.

86.    Fox's conduct has also violated and threatens to continue to violate the legitimate protectable interests of BioTAB, including, but not limited to, its right to protect its customer contacts and confidential and trade secret information, and has caused, and will continue to cause, serious and irreparable harm and injury to BioTAB.

87.    No legal remedy can adequately protect BioTAB from Fox's violations of Agreements I and II in that monetary damages are unascertainable, and, in any event, are on information and belief, beyond Fox's ability to satisfy.  If Fox is permitted to violate Agreements I and II, BioTAB's competitive advantage and profitability will be irreparably injured.  It will be impossible to measure that damage monetarily, as it will be impossible to determine, for example, which of Elite's strategic business decisions, including its desired growth through sales, among other things, were based on the confidential, proprietary, and trade secret information misappropriated, used, disclosed and not returned by Fox.

88.    BioTAB faces immediate and irreparable harm as a result of the conduct described in this Verified Complaint, and injunctive relief is necessary to afford BioTAB adequate relief.

89.    The harm to BioTAB if injunctive relief is not afforded substantially outweighs the harm to Fox if such relief is granted.

90.    There is a substantial likelihood that BioTAB will prevail on the merits.

91.    The public interest will be served by granting the requested relief in that the public policy supporting the ability to protect the secrecy of confidential, proprietary, and trade secret information will be upheld. BioTAB has made substantial efforts to ensure the secrecy of its confidential, proprietary, and trade secret information, as described more fully above.

92.    BioTAB has already suffered lost business opportunities as a result of Fox's violation of the non-solicitation obligations and will continue to lose opportunities if injunctive relief is not awarded.

93.    Unless enjoined, Fox's breaches of Agreements I and II will continue to cause irreparable harm to BioTAB for which BioTAB has no adequate remedy at law.

94.    Fox agreed that the restrictive covenants shall be tolled for any periods of violation. Exhibit B, § 6.2(b).

## COUNT II
## BREACH OF COMMON LAW DUTY OF LOYALTY
### (Against Fox)

95.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

96.    At all times material hereto, Fox was an employee of BioTAB who owed BioTAB a duty of loyalty not to act contrary to the interests of BioTAB during the course of his employment.

97.    Further, Fox owed a duty of loyalty to BioTAB not to actively exploit his position within the company for his own personal benefit or to hinder the ability of BioTAB to continue the business for which it had developed.

98.    Fox was an employee of BioTAB who had a duty not to compete with BioTAB concerning the subject matter of his employment.

99.    Moreover pursuant to Sections 2.3 of Agreements I and II, Fox agreed to, inter alia, devote his full business time, attention, efforts, abilities and energy to the business affairs and operations of BioTAB for the profit, benefit and advantage of BioTAB; and not to engage in any other business activity that conflicts with his  duties to BioTAB.

100.    As set forth above, which are incorporated by reference as if fully stated herein, upon information and belief, and in good faith based upon investigation, Fox served as an agent of Elite and on behalf of Elite while employed by BioTAB and engaged in a calculated and covert scheme to directly compete with BioTAB for the sole purpose of providing himself and Elite with an economic advantage over BioTAB.

101.    Upon information and belief, and in good faith based upon investigation, Fox at various times during his employment by BioTAB knowingly misappropriated and misused BioTAB's Confidential Information and Trade Secrets to and for his own personal benefit and the benefit of Elite all with the intent to defraud, gain an economic advantage over, and compete directly with BioTAB.

102.    The acts and conduct of Fox as described above constitutes a willful and malicious violation of his fiduciary duty of loyalty to BioTAB, which was perpetuated without justification.

103.    No legal remedy can adequately protect BioTAB from Fox's acts of disloyalty, in that; strict monetary damages to BioTAB are unascertainable.  If Fox is permitted to continue to benefit from his calculated and unlawful scheme to compete against BioTAB, then BioTAB's competitive edge and profitability will be irreparably and irrevocably injured.

104.    BioTAB faces immediate, irreparable, and irrevocable harm as a result of the conduct described herein.  Injunctive relief is therefore necessary to afford BioTAB adequate relief.

105.    The harm faced by BioTAB outweighs any harm Fox may suffer from this Court's granting injunctive and other relief; and it is in the public interest for the Court to grant the requested injunctive relief.

106.    BioTAB has also suffered damages as a result of certain of these breaches of loyalty in an amount to be determined at trial.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF
## DEFEND TRADE SECRETS ACT
### (Against Defendants)

107.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

108.    BioTAB owns, possesses, and developed over the years certain nonpublic, confidential, and proprietary information, including business contacts, customer lists, business plans and practices, marketing plans and practices, and other information related to its customers and candidates which Fox is familiar, and which Fox has a duty not to disclose or use, including on behalf of a competitor such as Elite.

109.    The information as described above derives independent economic value, actual and potential, from not being generally known, and specifically from not being known to competitors of BioTAB who could profit from its use or disclosure.

110.    Nor is the above-described information readily ascertainable by BioTAB's competitors or other persons by proper means.

111.    BioTAB's trade secrets provide it with an advantage over its competitors.

112.    BioTAB has expended significant resources in developing its trade secrets for its exclusive benefit.

113.    BioTAB  has made a reasonable efforts and took reasonable steps to keep the information secret, including by: maintaining the information in a secure server requiring a username and password, by having its employees sign agreements to agree to maintain the confidentiality of the information, by maintaining policies and procedures to maintain the

confidentiality of the information, training its employees on the importance of maintaining confidentiality, and by taking steps to determine whether breaches of the information occurred and respond accordingly, and by taking legal action where necessary to protect the information.

114.    This confidential and proprietary information involves and relates to customers and involves and relates to services intended to be used in interstate commerce. BioTAB's information constitutes trade secrets within the meaning of the federal Defend Trade Secrets Act, 18 U.S.C. §§1832, 1839.

115.    Fox gained access to and knowledge of these trade secrets by virtue of his employment with BioTAB.

116.    Fox's employment with Elite threatens disclosure and/or use of the confidential information and trade secrets of BioTAB. Such disclosure will benefit Fox and Elite, and violates not only Fox's agreements with BioTAB, but also the DTSA, 18 U.S.C. § 1831, et seq.

117.    Disclosure and/or use of BioTAB's trade secrets to a direct competitor such as Elite would be willful and malicious

118.    If Fox's conduct is not remedied, and if he is not enjoined, Fox will continue to use and/or disclose and/or inevitably use and/or disclose, for his own benefit and to BioTAB's detriment, BioTAB's trade secret information.

119.    Because BioTAB's remedy at law is inadequate, BioTAB seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secret information and other legitimate business interests.

**COUNT IV**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF**
**THE MISSOURI UNIFORM TRADE SECRETS ACT (MUTSA)**
**(Against Defendants)**

120.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

121.    BioTAB owns, possesses, and developed over the years certain nonpublic, confidential, and proprietary information, including business contacts, customer lists, business plans and practices, marketing plans and practices, and other information related to its customers and candidates which Fox is familiar, and which Fox has a duty not to disclose or use, including on behalf of a competitor such as Elite.

122.    The information as described above derives independent economic value, actual and potential, from not being generally known, and specifically from not being known to competitors of BioTAB who could profit from its use or disclosure. Nor is the above-described information readily ascertainable by BioTAB's competitors or other persons by proper means.

123.    BioTAB's trade secrets provide it with an economic advantage over its competitors.

124.    BioTAB has expended significant resources in developing its trade secrets for its exclusive benefit.

125.    BioTAB has made a reasonable efforts and took reasonable steps to keep the information secret, including by: maintaining the information in a secure server requiring a username and password, siloing data, by having its employees sign agreements to agree to maintain the confidentiality of the information, by maintaining policies and procedures to maintain the confidentiality of the information, training its employees on the importance of maintaining confidentiality, and by taking steps to determine whether breaches of the information occurred and respond accordingly, and by taking legal action where necessary to protect the information.

126.    Fox has knowledge of BioTAB's Trade Secrets and Confidential Information concerning its business plans and strategies, customer lists, financial information concerning the company's products and other proprietary information relating to BioTAB's business, the disclosure and misappropriation of which poses a significant threat to BioTAB's ongoing business in Missouri.

127.    BioTAB's Trade Secrets and Confidential Information, including but not limited to customer lists, has actual and potential independent and economic value to BioTAB, and is not generally known to or readily ascertainable by BioTAB's competitors.

128.    BioTAB's Trade Secrets and Confidential Information, including but not limited to customer lists, were developed by BioTAB and constitute "trade secrets" within the meaning of the  Missouri Uniform Trade Secret Act, §§ 417.450 through 417.467 R.S.Mo. (2011) ("Act").

129.    Fox's employment with Elite has and will continue to result in the inevitable disclosure and intentional disclosure of the Confidential Information and Trade Secrets of BioTAB.  Such disclosure will benefit Fox and Elite, and violates not only Fox's agreements with BioTAB, but also the violates the Missouri Uniform Trade Secrets Act, R.S. Mo. 417.450, et seq.

130.    Specifically, Fox's decision to proceed with this employment and sales position constitutes a willful disregard of BioTAB's trade secret rights.  Upon information and belief Fox, while acting within the scope of his employment with Elite and for the direct benefit of Elite, intentionally misappropriated BioTAB's trade secrets in the performance of his job duties.

131.    Moreover, by the very nature of the duties of Fox's new position at Elite, it is impossible that he would not use or disclose his knowledge of BioTAB's trade secrets to the detriment of BioTAB and for the benefit of Elite.  As such, the decision to proceed with this position results in a continuous threat of the misappropriation of BioTAB's trade secrets.

132.    As a consequence of the foregoing, BioTAB faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

133.    As the direct and proximate result of Fox's conduct, BioTAB has suffered and will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial, and is entitled to statutory exemplary damage, fees and costs.

134.    This Court has jurisdiction to enjoin the actual or threatened misappropriation of BioTAB's Trade Secrets pursuant to the Act and is authorized to award both actual and punitive damages for such misappropriation pursuant to the Act.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Against All Defendants)

135.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

136.    Through years of providing superior products and services within the BioTAB Market on a systematic and continuing basis, BioTAB had well-established business/customer relationships with numerous referral sources that gives rise to a valid and reasonable business expectancy of financial benefit.

137.    Fox and Elite have knowledge of BioTAB's customer relationships and valid and reasonable business expectancy of financial gain.

138.    Fox, individually and as an agent of Elite, intentionally contacted BioTAB's customers including, but not limited to, Healient Wound Care and University Health Vascular Clinic.

139.    In doing so, Fox and Integrity purposefully interfered with BioTAB's business expectancies with Healient Wound Care and University Health Vascular Clinic.

140.    Fox and Elite had no justification to interfere with BioTAB's business expectancies. Fox and Elite had no legal right justifying the actions they took.  Rather, they used improper means insofar as Agreements I and II clearly prohibited Fox from soliciting and providing services to BioTAB's customer and from misappropriating BioTAB's Trade Secrets.

141.    Elite, upon information and belief, had knowledge of the terms of Agreement I and II and assisted, induced, or otherwise allowed Fox to knowingly violate the terms for the purpose of interfering with BioTAB's reasonable business expectancies; and misappropriated BioTAB's Trade Secrets.  Thus, Fox and Elite had no justification and used improper means to interfere with BioTAB's reasonable business expectancies.

142.    As a direct and proximate cause of Fox's and Elite's aforementioned tortious interference, BioTAB has incurred and will continue to incur damages because BioTAB because of its lost business dealings with, inter alia, Healient Wound Care and University Health Vascular Clinic resulting in lost revenue, losing profits and its investment in its customer contacts.

143.    Upon information and belief, Fox and Elite's unlawful scheme continues and acting in concert with on another continue to interfere with BioTAB's reasonable business expectancies with its other customers resulting in additional damages.

144.    Fox and Elite are joint tortfeasors and are jointly and severally liable for all of BioTAB's damages resulting from their tortious interference with BioTAB's reasonable business expectancies.

145.    Fox's and Elite's actions set forth herein were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of BioTAB.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Elite)

146.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

147.    As detailed above, Fox is subject to a number of valid and enforceable post-employment restrictive covenants, including reasonably and narrowly tailored non-compete restrictions, with BioTAB.

148.    Upon information and belief, Elite has knowledge of Fox's contractual obligations to BioTAB.

149.    Despite knowledge of Fox's contractual obligations to BioTAB, Elite aided and induced Fox to breach his post-employment covenants including the non-competition restrictions by recruiting and hiring Fox and in direct violation of his covenants.

150.    Elite has no privilege or justification for its interference in BioTAB's contractual rights with its former employee.

151.    As a direct and proximate cause of Elite's aforementioned interference with BioTAB's contractual rights, BioTAB has incurred and will continue to incur damages.

152.    Elite's actions set forth herein were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of BioTAB.

153.    As a consequence of the foregoing, BioTAB faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

## **PRAYER FOR RELIEF**

WHEREFORE, by virtue of the foregoing acts and conduct complained of above, Plaintiff BioTAB, LLC d/b/a BioTAB Healthcare demands the following relief:

A.      For Count I, II and V though VI, a temporary, preliminary and permanent injunctive relief restraining and enjoining Fox, and those acting in concert with Fox, for a period of eighteen (18) months from the date of the entry of the Court's Order from continuing to breach Agreement I and II, specifically enforce the terms of Agreement I and II, and for actual damages, and all other remedies and damages at law to be proven at trial;

B.      For Counts III and IV, temporary, preliminary and permanent injunctive relief enjoining Fox and Elite from using and/or disclosing BioTAB's Trade Secrets and Confidential Information, and for actual and punitive damages to be proven at trial;

C.      For Count II, disgorgement of any compensation, commission, bonus, salary, commissions, or other gain received, directly or indirectly, by Fox during the period of his disloyal conduct.

D.      For Counts I, III-VI an equitable accounting equitable of all revenues and profits generated from Fox's breach of Agreements I and II, and Fox's and Elite's, misappropriation of its Trade Secrets, and their tortious conduct;

E.      An award of exemplary damages and/or punitive damages as permitted by law;

F.      Reasonable attorney's fees under the DTSA to the extent bad faith, or a willful and malicious misappropriation exists;

G.      Costs and disbursements of this action; and

H.      Such other and further relief as the Court may deem equitable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.

March 25, 2025                                 Respectfully Submitted,

                                               **AMUNDSEN DAVIS LLC**

                                               By: */s/  Timm W. Schowalter*
                                               Timm W. Schowalter, #45831
                                               James D. Maschhoff, #41821
                                               Ryan J. Jurgiel, #72869
                                               7711 Carondelet Ave., Suite 800
                                               St. Louis, MO 63105
                                               Phone: (314) 719-3700
                                               Fax: (314) 719-3761
                                               tschowalter@amundsendavislaw.com
                                               jmaschhoff@amundsendavislaw.com
                                               rjurgiel@amundsendavislaw.com

                                               ***Attorneys for BioTAB, LLC d/b/a BioTAB Healthcare***

## CERTIFICATE OF SERVICE

The undersigned certifies that today, March 25, 2025, a copy of the foregoing document was served via Federal Express on Defendant Elite' Registered Agent and via facsimile to Defendant Elite's principal place of business; and via Federal Express and Electronic Mail to Defendant Fox at:

**Adam V. Fox**
8908 Pine St.
Lenexa, KS 66220
avfox6488@gmail.com

**WEST SIDE MEDICAL SUPPLY, INC.**
**d/b/a Elite Compression and Bracing**
**c/o Registered Agent:** Dr. Justin Gooden
602 North Webb Road, Ste 108
Wichita, KS 67206
Facsimile No.: (316) 636-7939

*/s/ Timm W. Schowalter*

## VERIFICATION

STATE OF MICHIGAN       )
                             ) SS
KALAMAZOO COUNTY    )

       Raymond Corey, Regional Sales Manager of BioTAB Healthcare, being duly sworn on his oath, states that he has read the foregoing Verified Complaint and, pursuant to 28 U.S.C. §1746, declares under penalty of perjury that the statements contained therein are true and accurate based on personal knowledge and belief and his review of BioTAB's business records unless otherwise stated.

                                                 **RAYMOND COREY**

Dated: March 25, 2025

33